# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:13cr44

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ) | |
| v. ) | |
| ) | |
| HERMANT SAHNEY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Pending before the Court is the Motion to Suppress [# 24] filed by Defendant. The Grand Jury returned a Bill of Indictment charging Defendant with two counts of possession with intent to distribute synthetic marijuana in violation of 21 U.S.C. § 841(a)(1), the sale of drug paraphernalia intended or designed for inhaling a controlled substance into the body in violation of 21 U.S.C. § 863, and conspiracy to distribute and possess with the intent to distribute synthetic marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1). Defendant moves to suppress the evidence obtained during the search of his room and vehicles. Specifically, Defendant contends that his written consent to search his vehicles and place of residence was not voluntarily given. On September 30, 2013, the Court

1

conducted a hearing on the motion and heard evidence from the Government and the arguments of counsel. Defendant did not put on any evidence. Having carefully considered the evidence, the briefs, the transcript of the hearing, and the arguments of counsel, the Court **RECOMMENDS** that the District Court **DENY** the motion. [# 24].

I. Background

In June 2012, The Department of Homeland Security, the Buncombe County Sheriff's Office, and the Buncombe County Anticrime Task Force were investigating the sale of synthetic marijuana and bath salts at a store in Weaverville, North Carolina. (Suppression Hr'g Tr. 5, Sept. 30, 2013.) On June 5, 2012, undercover agents purchased bath salts from the store. (Hr'g Tr. at 6.) Subsequently, investigators obtained and executed a search warrant for the store, which resulted in the seizure of bath salts, synthetic marijuana, U.S. currency, and drug paraphernalia. (Hr'g Tr. at 7.)

The proprietor of the store then agreed to make a consensually monitored phone call to his supplier, who was residing at a Days Inn located off Airport Road in Fletcher. (Hr'g Tr. at 7, 120.) During this phone call, the proprietor ordered additional bath salts and synthetic marijuana. (Hr'g Tr. at 8-9, 120.) The officers were later able to identify the proprietor's supplier as Defendant. (Hr'g Tr. at 8,

2

120.) Defendant is a 53 or 54 year old male and a lawful permanent resident of Indian descent. (Hr.'g Tr. at 8.) Defendant also owns the Days Inn in Fletcher where he was living at the time. (Hr.'g Tr. at 8.)

In addition to setting up the phone call, the investigators set up surveillance of the Days Inn to monitor Defendant's activity. (Hr'g Tr. at 9.) The investigators witnessed Defendant arrive at the Days Inn driving a Jaguar and get into a Dodge Sprinter. (Hr'g Tr. at 9.) Defendant then proceeded to drive westbound on Interstate 26 towards Weaverville. (Hr'g Tr. at 9.)

Approximately two hours after the proprietor called Defendant to request additional product, Corporal Jason Sales with the Buncombe County Sheriff's Office initiated a traffic stop of the Dodge Sprinter for speeding. (Hr'g Tr. at 9, 56-58, 70.) Corporal Sales was driving a marked patrol car and was in uniform at the time. (Hr'g Tr. at 57.) After Corporal Sales turned on his blue lights, Defendant pulled over on the side of Interstate 26 under the Brevard Road bridge. (Hr'g Tr. at 58.) Corporal Sales pulled his patrol car behind the Dodge Sprinter. (Hr'g Tr. at 59, 65.) Deputy Jeffrey Lemons with the Buncombe County Sheriff's Office was serving as backup for Corporal Sales at the time and pulled his patrol car directly behind Corporal Sales's vehicle. (Hr'g Tr. at 59, 79, 81.) Like Corporal Sales, Deputy Lemons was in uniform and driving a marked patrol car.

(Hr'g Tr. at 79-80.)

After pulling over the Dodge Sprinter, Corporal Sales approached the Defendant. (Hr'g Tr. at 59-60.) Corporal Sales identified himself, told Defendant the reason for the stop, and then asked him to step out of the vehicle so that Corporal Sales could get out of the way of oncoming traffic. (Hr'g Tr. at 60-61, 71.) After Defendant exited the Dodge Sprinter, Corporal Sales asked for identification and inquired as to the contents of the vehicle. (Hr'g at Tr. 61.) Corporal Sales communicated in English and Defendant responded in English. (Hr'g at Tr. 60, 82.) Defendant had no trouble understanding Corporal Sales. (Hr'g Tr. at 60-61, 71, 82.)

Subsequently, Corporal Sales asked for consent to search the Dodge Sprinter, and Defendant agreed to allow the search of the vehicle. (Hr'g Tr. at 61, 82-83.) Defendant then unlocked the back two doors of the vehicle. (Hr'g Tr. at 61-62.) In requesting consent to search the vehicle, neither Corporal Sales nor Deputy Lemons raised their voices toward Defendant, threatened Defendant, made any promises to Defendant in order to get him to consent to the search, or had their weapons drawn or their hands on their weapons. (Hr'g Tr. at 62, 82-83.) Defendant was not in handcuffs at the time. (Hr'g Tr. at 62.)

After the Defendant opened the doors to the Dodge Sprinter, Deputy

Lemons began searching the vehicle. (Hr'g Tr. at 63, 83.) While searching a box inside the vehicle, Deputy Lemons discovered several clear containers with a crystalline-like powder. (Hr'g Tr. at 84.) Deputy Lemons and Corporal Sales both suspected that the substance was contraband. (Hr'g Tr. at 63, 84-85.) Deputy Lemons then stopped searching the vehicle, and Corporal Sales made a call to report what he found in the vehicle. (Hr'g Tr. at 10, 63, 85.) Some of the officers from the larger investigation then appeared on the scene in a separate vehicle. (Hr'g Tr. at 64, 68-69.) Because of the danger associated with conducting a more thorough search of the Dodge Sprinter while it was sitting on the side of the interstate, the officers made the decision to move the vehicle approximately a half mile away to the Farm Bureau parking lot. (Hr'g Tr. at 10, 36-37, 64, 85, 90.)

Amy Seed, a detective with the Buncombe County Sheriff's Office drove the Dodge Sprinter to the parking lot while Corporal Sales transported Defendant in his patrol car. (Hr'g Tr. at 11, 37, 64, 89-90.) Defendant was not in handcuffs or restraints at the time and agreed to go to the parking lot. (Hr'g Tr. at 64.) The officers arrived at the parking lot at approximately 6:53 p.m., less than twenty minutes after Corporal Sales initiated the traffic stop. (Hg'r Tr. at 10, 64, 70.)

When Defendant arrived at the Farm Bureau parking lot, two agents from The Department of Homeland Security were waiting to speak with Defendant,

5

including Special Agent Evan Campanella. (Hg'r Tr. at 3, 11, 39.) Special Agent Campanella introduced himself to Defendant and showed Defendant his credentials, including his badge. (Hr'g Tr. at 11, 40.) In addition, Special Agent Campanella told Defendant about the phone call. (Hr'g Tr. at 11.) Although Defendant spoke with an accent, he understood English and spoke to Special Agent Campanella and the other officers in English. (Hr'g Tr. at 16, 95.) At no point did Defendant express that he was having a difficult time understanding Special Agent Campanella. (Hr'g Tr. at 16.) At this point, a total of seven officers were on the scene. (Hr'g Tr. at 39.) Only Corporal Sales and Deputy Lemons were in uniform and had weapons visible in a holster. (Hr'g Tr. at 39-40, 52.) None of the officers, however, ever had their weapons drawn in the parking lot or their hands on their weapons. (Hr'g Tr. at 18, 95.)

Before continuing the search of the Dodge Sprinter in the Farm Bureau parking lot, the officers again obtained the oral and written consent of Defendant to search the vehicle. (Hr'g Tr. at 11-12.) The officers obtained the written consent on a Buncombe County Sheriff's Office Consent to Search Form. (Hr'g Tr. at 12, 91; Gov.'s Ex. 1.) The written consents state that:

> I give this consent and permission freely and voluntarily without any promise made to me or threats of any kind made against me, and I understand any evidence of a crime or illegal object or illegal substance may be seized as a result of this search.

(Gov.'s Ex. 1.)  Defendant signed the consent form, as did  two officers as witnesses. (Hr'g Tr. at 14, 91; Gov. Ex. 1.)  In obtaining the written consent from Defendant to search the Dodge Sprinter, none of the officers on the scene threatened Defendant, raised their voices, or drew their weapons, and Defendant was not in handcuffs.  (Hr'g Tr. 95.)   After obtaining consent a second time, the officers proceeded to search the Dodge Sprinter.  (Hr'g Tr. at 15, 91.)

While the officers were searching the Doge Sprinter, Defendant was free to move around the parking lot and smoke cigarettes and he was not in handcuffs. (Hr'g Tr. at 15-17.)   Defendant was cordial with the officers and did not appear nervous or confrontational.  (Hr'g Tr. at 16.)

As the officers were searching the Dodge Sprinter, Defendant told Special Agent Campanella that he was living at the Days Inn in room 119 and that his wife and daughter were living in a separate room.  (Hr'g Tr. at 15.)  Special Agent Campanella asked Defendant if he would agree to go back to the Days Inn and allow the officers to search his room.  (Hr'g Tr. at 15, 17.)  Defendant agreed. (Hr'g Tr. at 15, 17.)   At no point during his interaction with Defendant in the parking lot did Special Agent Campanella raise his voice when talking to Defendant.  (Hr'g Tr. at 17.)  None of the officers threatened Defendant or made

any promises to him to get him to consent to the search of the Dodge Sprinter or his residence. (Hr.'g Tr. at 17.)

At this point, Defendant was transported from the parking lot to the Days Inn. (Hr'g Tr. at 16.) Once Defendant left the parking lot, the officers halted the search of the Dodge Sprinter. (Hr'g Tr. at 15-16.) Defendant was not in handcuffs when Special Agent Campanella transported him to the Days Inn. (Hr'g Tr. at 18.) Special Agent Campanella did not raise his voice with Defendant, did not threaten Defendant, and did not make Defendant any promises while he was transporting Defendant to the Days Inn. (Hr'g Tr. at 19.)

Because the Days Inn was in a different jurisdiction, Special Agent Campanella called the Henderson County Sheriff's Office to inform them that Defendant had granted oral consent to search his room at the Days Inn and request that they assist in the investigation. (Hr'g Tr. at 18-19, 100.) Upon arriving at the Days Inn, Special Agent Campanella explained to Defendant's wife the situation and the fact that Defendant had consented to a search of room 119. (Hr'g Tr. at 19-20.) None of the officers raised their voices with Defendant's wife, threatened her, or made her any promises. (Hr'g Tr. at 20.) The officers then swept the main living area with their weapons drawn prior to searching the room in order to insure that the premises were safe for the officers to enter and search. (Hr'g Tr. at 20-21.)

At no other point did any of the officers draw their weapons. (Hr'g Tr. at 22.) Approximately ten officers were at the Days Inn at the time. (Hr'g Tr. at 50, 54.)

As Special Agent Campanella was walking with Defendant to room 119, he noticed a white box truck in the back parking lot of the Days Inn. (Hr'g Tr. at 22.) Defendant stated that the truck was his and agreed to allow the officers to also search the truck. (Hr'g Tr. at 22.) Again, Special Agent Campanella did not raise his voice while talking to Defendant, did not threaten him, and did not make him any promises. (Hr'g Tr. at 23.) Defendant was calm, cordial, and cooperative at the time. (Hr'g Tr. at 23.)

Once Deputy Eric Elliott with the Henderson County Sheriff's Office arrived at the Days Inn he identified himself to Defendant and explained the written consent form. (Hr'g Tr. at 24, 101.) Deputy Elliott communicated with Defendant in English, Defendant communicated with Deputy Elliott in English, and Defendant did not have trouble understanding Deputy Elliott. (Hr'g Tr. at 103, 107.) Defendant then looked over the document and signed the consent form. (Hr'g Tr. at 25, 101, 106.) The Consent to Search form provided that:

> I, the undersigned having been informed of my constitutional rights to not have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse consent to such a search, hereby give consent and authorize officer Elliott and any person he/she may need to conduct complete search of my residence and/or vehicle located at: Days Inn Motel / Underwood Rd / Room 119. The

> above named law enforcement officer is employed by the Henderson county Sheriff's Office.
>
> This officer and his/her associates are authorized to take from my residence and/or vehicle and letters, papers, electronic data, materials, or other property which they may desire.
>
> This written permission is given by me to the above mentioned officer voluntarily, without threats or promises of any kind.

(Gov.'s Ex. 2.) None of the officers raised their voices while talking with Defendant, threatened Defendant, tried to intimidate Defendant, made him any promises, or restricted his movement. (Hr'g Tr. at 25, 102-04.)

After obtaining written consent to search the premises and the vehicles, the officers began searching room 119, the box truck, and the Jaguar. (Hr'g Tr. at 23, 53-54.) At some point during the search, Special Agent Campanella noticed a door in the lobby of the Days Inn. (Hr'g Tr. 29.) Special Agent Campanella then obtained oral consent from Defendant's wife to search the room, and she provided Special Agent Campanella with a key to unlock the door. (Hr'g Tr. at 29.) Upon opening the door, Special Agent Campanella was overwhelmed with the smell of synthetic marijuana and backed out of the room. (Hr'g Tr. at 29.) Defendant was then brought back into the area and Special Agent Campanella obtained written consent to search the room. (Hr'g Tr. at 30; Gov. Ex. 3.) The Consent to Search form was the same form that the officers used in obtaining written consent to

search room 119. (Gov.'s Ex. 2; Gov.'s Ex. 3; Hr'g Tr. at 30.) In obtaining Defendant's written consent to search the additional room, none of the officers raised their voices with Defendant, threatened Defendant, made any promises to Defendant, or drew their weapons. (Hr'g Tr. at 30.)

Subsequently, the officers seized a money counting machine, bath salts, and synthetic marijuana from room 119. (Hr'g Tr. at 27.) The officers seized drug paraphernalia and synthetic marijuana from the box truck. (Hr'g Tr. at 27-28.) From the storage room, the officers seized synthetic marijuana and drug paraphernalia. (Hr'g Tr. at 32-33.)

The next day Jeffrey Austin with the Buncombe County Sheriff's Office wrote an application for a search warrant for the Dodge Sprinter. (Hr'g Tr. 16, 19, 114.) After obtaining the search warrant from Superior Court Judge Gary Gavenus, officers executed the warrant and discovered bath salts, synthetic marijuana, and drug paraphernalia. (Hr.'g Tr. 115, 121.)

Defendant now moves to suppress all the evidence found during the various searches on the basis that he did not knowingly and voluntarily consent to the searches at issue. Defendant's motion is now before this Court for a Memorandum and Recommendation to the District Court.

## II. Discussion

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend 4. Generally speaking, the Fourth Amendment prohibits warrantless searches. United States v. Buckner, 473 F.3d 551, 553-4 (4th Cir. 2007). Voluntary consent to a search, however, is an exception to this general rule. United States v. Neely, 564 F.3d 346, 349-50 (4th Cir. 2009); United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). Consent to search is valid where it is knowing and voluntary and giving by an individual with authority to consent. United States v. Digiovanni, 650 F.3d 498, 513 (4th Cir. 2011); Buckner, 473 F.3d at 554. The Government bears the burden of demonstrating by a preponderance of the evidence that the officers obtained valid consent to conduct the search at issue. Digiovanni, 650 F.3d at 513.

In determining whether the Defendant freely and voluntarily gave consent to search, the Court must examine the totality of the circumstances surrounding the consent. United States v. Boone, 245 F.3d 352, 361 (4th Cir. 2001); Lattimore, 87 F.3d at 650. This is factual question for the Court to determine based on the

evidence in the record. See Digiovanni, 650 F.3d at 514. "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." Lattimore, 87 F.3d at 650; see also Digiovanni, 650 F.3d at 514. "Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew or his right to refuse consent to prove that consent was voluntary." Boone, 245 F.3d at 362. In addition, written consent supports a finding that the individual voluntarily consented to the search. Id.; United States v. Coleman, 588 F.3d 816, 819 (4th Cir. 2009). Finally, pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347, 94 S. Ct. 613, 619 (1974).

Defendant does not dispute that he had authority to consent to the search of the areas searched by the officers. Thus, the only issue for the Court is whether the Government has satisfied its burden of demonstrating that his consent was freely and voluntarily given to the officers. Upon a review of all the evidence in the

record, the Court finds that the Government has satisfied its burden in this case.

The undisputed testimony is that Defendant freely and voluntarily gave both oral and written consent to search the Dodge Sprinter, room 119 at the Days Inn, the box truck, his Jaguar, and the storage room. Defendant spoke English, understood English, and had no trouble understanding and communicating with the officers.[1] In fact, there is no evidence in the record that Defendant spoke any language other than English. Defendant was not so old or young that he would have been unable to knowingly consent and had the maturity and intelligence to knowingly and freely consent to the searches. At a minimum, Defendant had the maturity, intelligence, experience, and comprehension of the English language to own and participate in the management of a Days Inn motel in the United States.

Moreover, none of the officers threatened Defendant, raised their voices with Defendant, made him any promises, intimidated him, or in any way coerced him into consenting to the searches at issue. Similarly, the record is devoid of any evidence that any of the officers threatened or made promises to his wife or family or that any officer used Defendant's immigration status as a means of coercing written consent to search the vehicles and Days Inn. Defendant was not in

---

[1] The Court notes that English is a functioning language in India and that even parts of the Indian government are conducted in English. See e.g. India Const. art. 348; Janice M. Mueller, The Tiger Awakens: The Tumultuous Transformation of India's Patent System and the Rise of Indian Pharmaceutical Innovation, 68 U Pitt. L. Rev. 491, 620 (2007); Jeffrey Colin, Coming into Compliance with Trips: a Discussion of India's New Patent Laws, 25 Cardozo Arts and Ent. L.J. 877, 892 (2007).

custody or otherwise detained at the time of the consents and he was free to leave. At no point did Defendant change his mind or otherwise attempt to revoke his written consent to search.

When Defendant initially orally consented to the search of the Dodge Sprinter only two officers were present and he had only been pulled over for a short period of time. Although a number of officers were on the scene at the Farm Bureau parking lot and at the Days Inn when Defendant signed the three consent to search forms, their presence did not transform a knowing and voluntary consent to search into an unlawful one under the circumstances of this case. Based on the record before the Court, and considering the totality of the circumstances, the Court finds that each of the consents to search given by Defendant was knowingly and voluntarily given by an individual with authority to consent. Accordingly the searches at issue in this case were proper and any evidence obtained pursuant to those searches is admissible. The Court, therefore, **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [# 24].

## III. Conclusion

The Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [# 24].

Signed: November 15, 2013

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(c), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).